```
_____ FILED        _____ RECEIVED
_____ ENTERED      _____ SERVED ON
                CCUNSEL/PARTIES OF RECORD

                    JUL 2 2 2025

          CLERK US DISTRICT COURT
             DISTRICT OF NEVADA

BY: _____ DEPUTY
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| *IN RE* **RECEIVERSHIP OF MTE LLC AND MICHAEL W. TYLER, SR.** ) ) ) ) | |
| ———————————————————— ) | |
| CASH TODAY, LLC, and ) MONEYBOX ATM NEVADA LLC ) ) | |
| Plaintiffs, ) ) | Case No.: |
| v. ) ) | |
| MTE LLC, and ) MICHAEL W. TYLER, SR. ) ) | **2:25-ms-00059** |
| Defendants. ) ) | |

### NOTIFICATION OF APPOINTMENT OF RECEIVER

The undersigned counsel for Plaintiffs hereby provide notice, pursuant to 28 U.S.C. § 754, of the appointment of Christopher S. Dove as Receiver in the Receivership established in *Cash Today, LLC and Moneybox ATM Nevada LLC v. MTE LLC and Michael W. Tyler, Sr.*, Case No. 21-CV-2360-EFM, United States District Court for the District of Kansas (the "Action"). The Complaint in the Action is attached hereto as Exhibit A. The Order Appointing Receiver in the Action is attached hereto as Exhibit B.

Dated: July 21, 2025

Respectfully submitted,

CASH TODAY, LLC and
MONEYBOX ATM NEVADA LLC

By: /s/ Philip A. O'Connell, Jr.
    Philip A. O'Connell, Jr. (NV Bar: #4347)
    Dentons US LLP
    101 Federal Street, Suite 1900
    Boston, MA 02110
    Tel: 617-235-6802
    philip.oconnelljr@dentons.com

1

## CERTIFICATE OF SERVICE

I, Philip A. O'Connell, Jr., hereby certify that, on July 21, 2025, I sent the foregoing document to the Clerk of the Court by FedEx overnight mail. I further hereby certify that, on July 21, 2025, I served the following by email:

Christopher S. Dove
FAGAN & EMERT, L.L.C.
800 New Hampshire St., Ste. 110
Lawrence, Kansas 66044
Email: cdove@faganemert.com
*Receiver*

Daniel E. Stuart
Charlie Edgeller
Law Office of Daniel E. Stuart, P.A.
4707 College Boulevard, Suite 208
Leawood, Kansas 66211
Email: Daniel@StuartLaw.net
Email: Charlie@StuartLaw.net
*Attorneys for Defendants*

/s/ Philip A. O'Connell, Jr.
Philip A. O'Connell, Jr.

# EXHIBIT

# A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CASH TODAY LLC, and | ) | |
| MONEYBOX ATM NEVADA LLC, | ) | |
| | ) | |
| **Plaintiffs,** | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | |
| MTE LLC a/k/a MTE PLATINUM CASH | ) | |
| LLC, and MICHAEL W. TYLER, SR. | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiffs CASH TODAY LLC ("Cash Today") and MONEYBOX ATM NEVADA LLC ("MoneyBox," and collectively with Cash Today, "Plaintiffs"), for their causes of action against Defendants MTE LLC a/k/a MTE PLATINUM CASH LLC ("MTE") and Michael W. Tyler, Sr. ("Tyler," and collectively with MTE, "Defendants") state as follows:

## PARTIES, JURISDICTION AND VENUE

1.  Cash Today is an Arizona limited liability company whose sole member is Sue Klopf, an individual who resides in Iowa.

2.  MoneyBox is a Nevada limited liability company whose sole member is Patrick Klopf, an individual who resides in Iowa.

3.  MTE is a Kansas limited liability company whose members, upon information and belief, are Tyler and Michael W. Tyler, Jr., individuals who both reside in Kansas. MTE also does business as MTE PLATINUM CASH LLC, a Nevada limited liability company whose status is revoked with the Nevada Secretary of State. MTE can be served by service on Tyler at his residence located at 435 S. 100th Street, Edwardsville, Kansas 66111.

4.  Tyler is an individual that resides in Kansas, who can be served at his residence

located at 435 S. 100th Street, Edwardsville, Kansas 66111.

5.     This is a civil action seeking money damages and related relief pursuant to the causes of action identified herein.  This Court has diversity jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and because, upon information and belief, the citizenship of each of Plaintiffs is diverse from each of Defendants.

6.     This Court has personal jurisdiction over each of Defendants because each resides in Kansas.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because each of Defendants resides in Kansas in this judicial district.

### FACTS COMMON TO ALL COUNTS

8.     On or about March 11, 2019, MTE, as seller, and Cash Today, as buyer, reached an agreement pursuant to which MTE agreed to sell and Cash Today agreed to buy certain ATM routes in Las Vegas, Nevada and related assets, including $200,00.00 of cash, contracts, equipment, placements and information related to the ATM routes (collectively, the "Purchased ATM Assets").

9.     The Purchased ATM Assets consisted of approximately 29 ATM relationships.

10.     MTE's and Cash Today's agreement relating to the Purchased ATM Assets was memorialized in the Asset Purchase Agreement attached as **Exhibit A** and incorporated herein by this reference.

11.     Sue Klopf, on behalf of Cash Today, executed the Asset Purchase Agreement.

12.     The executed Asset Purchase Agreement was sent to MTE by text message to Tyler, who responded to the text message by providing wire instruction details for Cash Today to

make payment.

13.    MTE did not execute the Asset Purchase Agreement, but by both express agreement and intentional action, MTE agreed to the purchase terms stated in the Asset Purchase Agreement.

14.    Pursuant to the agreement of the parties, including as identified in the Asset Purchase Agreement, Cash Today paid MTE $615,000.00 by two separate wire transfers in the amounts of $145,000.00 and $470,000.00 executed on March 13, 2019.  A true and correct copy of the wire transfer authorizations that were ultimately executed are attached collectively as **Exhibit B** and incorporated herein by this reference.

15.    As reflected in the wire transfer authorizations, the wire transfers were made to a "seller of business" for the purpose of "business purchase."

16.    As reflected in the wire transfer authorizations, the wire transfers were made to an MTE bank account at Security Bank of Kansas City in Kansas City, Kansas.

17.    MTE accepted payment of $615,000.00 as reflected in the Asset Purchase Agreement and as agreed by MTE and Cash Today.

18.    Cash Today made payment of $615,000.00 to purchase the Purchased ATM Assets and in consideration of MTE's promises to provide the related services identified in the Asset Purchase Agreement.

19.    Cash Today would not have made payment of $615,000.00 unless such payment was for purchase of the Purchased ATM Assets and in consideration of the identified services.

20.    MTE, through Tyler, represented and agreed that payment of $615,000.00 was for Cash Today's purchase of the Purchased ATM Assets and in consideration of MTE's promise to provide the identified services.

3

21.     As reflected in the Asset Purchase Agreement, and as agreed between MTE and Cash Today, MTE was obligated upon closing to "transfer all contracts, equipment, placements and information it currently owns and controls."

22.     The Purchased ATM Assets included all ATM routes and related assets owned by MTE in Las Vegas, Nevada.

23.     As also reflected in the Asset Purchase Agreement, and as also agreed between MTE and Cash Today, MTE was obligated upon closing to "provide $200,000.00 vault cash, 3 weeks of employee training and 2 months of accounting/bookkeeping services."

24.     The "$200,000.00 vault cash" included cash that was in circulation relating to the 29 ATM relationships, including in MTE's bank vault account, in ATM machines, or otherwise in transition between the vault account or in ATM machines.

25.     MTE and Cash Today agreed that upon closing Cash Today shall be added as an authorized party with respect MTE's bank vault account, with sole right to possession and control of MTE's bank vault account.

26.     Upon information and belief, at or about the time of the closing of the sale, which was on or about March 13, 2019, MTE identified the amount of cash in circulation and identified that approximately $250,000.00 was in circulation, rather than the $200,000.00 identified in the Asset Purchase Agreement and agreed to be sold by MTE to Cash Today.

27.     MTE and Cash Today agreed that Cash Today shall retain possession and benefit of the additional approximately $50,000.00 of cash in circulation in exchange for payment of the amount of the additional cash in circulation.

28.     Cash Today and its successor-in-interest MoneyBox paid MTE the amount of the additional cash in circulation.

29.    After the closing of the sale of the Purchased ATM Assets, MTE added Cash Today as an authorized party with respect to MTE's bank vault account, transferred dominion and control over the ATMs and related equipment relating to the Purchased ATM Assets to Cash Today, and transferred dominion and control of the ATM routes and related relationships relating to the Purchased ATM Assets to Cash Today.

30.    Upon closing of the sale of the Purchased ATM Assets, MTE was required to fully transfer all the Purchased ATM Assets and related interests of MTE in Las Vegas, Nevada.

31.    After the closing of the sale of the Purchased ATM Assets, MTE had no right to dominion or control over any of the Purchased ATM Assets or related interests formerly owned by MTE, and sold to Cash Today, in Las Vegas, Nevada.

32.    After the closing of the sale of the Purchased ATM Assets, MTE provided Cash Today copies of certain contracts and provided certain information relating to the Purchased ATM Assets.

33.    MTE did not, and has not upon multiple demands by Cash Today, executed the appropriate documents to document transfer of all contracts, equipment, placements and information it owned in Las Vegas, Nevada, as required by the Asset Purchase Agreement and the agreement between MTE and Cash Today.

34.    The Purchased ATM Assets, however, were constructively delivered to Cash Today by MTE, including that MTE turned over dominion and control of the ATM routes and relationships, access to the purchased ATMs, the cash vault account, and the terminal identification numbers for the ATMs.

35.    Cash Today accepted delivery of the Purchased ATM Assets and related interests.

36.    After the closing of the sale of the Purchased ATM Assets, MTE failed to provide

the agreed "3 weeks of employee training and 2 months of accounting/bookkeeping services."

37.    Before the closing of the sale of the Purchased ATM Assets, MTE gave direction regarding and operated the business and relationships relating to the Purchased ATM Assets.

38.    Before the closing of the sale of the Purchased ATM Assets, MTE took the actions, incurred the obligations, and retained the benefits ordinarily taken, incurred, and retained by an owner of ATM route assets relating to the Purchased ATM Assets.

39.    For example, before the closing of the sale of the Purchased ATM Assets, MTE maintained the equipment at its expense, including the ATMs, relating to the Purchased ATM Assets.

40.    For example, before the closing of the sale of the Purchased ATM Assets, MTE received the ATM surcharges and fees ordinarily retained by an owner of ATM route assets relating to the Purchased ATM Assets.

41.    After the closing of the sale of the Purchased ATM Assets, Cash Today gave direction regarding and operated the business and relationships relating to the Purchased ATM Assets.

42.    After the closing of the sale of the Purchased ATM Assets, Cash Today otherwise took the actions, incurred the obligations, and retained the benefits ordinarily taken, incurred, and retained by an owner of ATM route assets relating to the Purchased ATM Assets.

43.    For example, after the closing of the sale of the Purchased ATM Assets, Cash Today maintained the equipment at its expense, including that ATMs, relating to the Purchased ATM Assets.

44.    For example, after the closing of the sale of the Purchased ATM Assets, Cash Today received the ATM surcharges and fees ordinarily retained by an owner of ATM route

assets relating to the Purchased ATM Assets.

45.    In exchange for good and valid consideration, Cash Today transferred its rights as owner of the Purchased ATM Assets to MoneyBox.

46.    In the 16 months following the closing of the sale of the Purchased ATM Assets, Cash Today, then MoneyBox, gave direction regarding and operated the business and relationships relating to the Purchased ATM Assets.

47.    In the 16 months following the closing of the sale of the Purchased ATM Assets, Cash Today, then MoneyBox, operated the business and maintained the relationships concerning the Purchased ATM Assets and took the actions, incurred the obligations, and retained the benefits ordinarily taken, incurred, and retained by an owner of ATM route assets relating to the Purchased ATM Assets.

48.    For example, in the 16 months following the closing of the sale of the Purchased ATM Assets, Cash Today, then MoneyBox, maintained the equipment at its expense, including that ATMs, relating to the Purchased ATM Assets.

49.    For example, in the 16 months following the closing of the sale of the Purchased ATM Assets, Cash Today, then MoneyBox received the ATM surcharges and fees ordinarily retained by an owner of ATM route assets relating to the Purchased ATM Assets.

50.    In those 16 months, neither MTE nor Tyler apparently exercised dominion or control over the Purchased ATM Assets and related business and relationships, except that MTE entered into certain contracts with ATM customers of Cash Today, then MoneyBox.

51.    MTE asserted to Cash Today and MoneyBox that maintaining the same counterparty relationship - MTE rather than Cash Today or MoneyBox - with the ATMS customers would better ensure that the customer would not seek to negotiate contract

concessions often sought with a change in ownership.

52.    During those 16 months, Cash Today, then MoneyBox, acted primarily through Michael Klopf ("Mike Klopf"), who is Sue Klopf's son and Patrick Klopf's brother.

53.    Part of Mike Klopf's responsibilities included loading the various ATM machines with cash.

54.    Unfortunately and unexpectedly, Mike Klopf died on July 20, 2020.

55.    Following Mike Klopf's death, business continued seemingly as usual with MoneyBox acting as the owner and operator of the business and relationships relating to the Purchased ATM Assets.

56.    Following Mike Klopf's death, Travis Milcher, who was introduced to MoneyBox by Tyler, was engaged to load the various ATM machines with cash.

57.    Travis Milcher was paid a per-transaction fee by MoneyBox in payment of his duties as loader, and MoneyBox received the remainder of surcharges and fees except as agreed with third parties, including its ATM customers and ATM service processor.

58.    In addition to, and separate from, the relationships and business associated with the Purchased ATM Assets, MoneyBox developed relationships with other ATM customers and built a separate route of ATM relationships and business (the "Non-Purchased ATM Assets").

59.    ATM route owners use an ATM service processor to perform the data and service functions necessary to complete ATM transactions and to pay surcharges and other fees as directed by the ATM route owner.

60.    Prior to the closing of the sale of the Purchased ATM Assets, MTE used SwypCo, LLC ("SwypCo") as its ATM service processor relating to the Purchased ATM Assets.

61.    MTE encouraged Cash Today to continue to use SwypCo as the ATM service

processor with respect to the Purchased ATM Assets upon closing of the sale of the Purchased ATM Assets.

62.     Cash Today continued to use SwypCo as the ATM service processor with respect to the Purchased ATM Assets upon closing of the sale of the Purchased ATM Assets.

63.     Upon purchase from Cash Today, MoneyBox continued to use SwypCo as the ATM service processor with respect to the Purchased ATM Assets.

64.     MoneyBox also used SwypCo with respect to its ownership of the Non-Purchased Assets.

65.     MoneyBox also owns ATM routes and related assets in Arizona and Iowa.

66.     MoneyBox has a direct contractual relationship with SwypCo.

67.     Cash Today, then MoneyBox, understood that after the closing of the sale of the Purchased ATM Assets, Cash Today, then MoneyBox, had the sole right to give direction to SwypCo relating to the Purchased ATM Assets.

68.     MoneyBox understood that it had the sole right to give direction to SwypCo relating to the Non-Purchased ATM Assets.

69.     Upon information and belief, MTE failed to take the actions necessary to fully relinquish control over the relationship with SwypCo relating to the Purchased ATM Assets.

70.     Upon information and belief, SwypCo identified the Non-Purchased Assets under the same account or collection of accounts as the Purchased ATM Assets.

71.     In the 16 months following the closing of the sale of the Purchased ATM Assets, SwypCo took direction from Cash Today, then MoneyBox, relating to the Purchased ATM Assets.

72.     In the 16 months following the closing of the sale of the Purchased ATM Assets,

SwypCo took direction from MoneyBox relating to the Non-Purchased ATM Assets.

73.     In October 2020, MoneyBox explored possible sale of the remaining Purchased ATM Assets and Non-Purchased ATM Assets.

74.     MoneyBox obtained an appraisal of $365,000.00 for the remaining Purchased ATM Assets and Non-Purchased ATM Assets.

75.     MoneyBox discussed selling the remaining Purchased ATM Assets and Non-Purchased ATM Assets to Travis Milcher.

76.     After MTE and Tyler became aware that MoneyBox had interest in selling the Purchased ATM Assets and Non-Purchased ATM Assets, MTE and Tyler interfered with MoneyBox's sale discussions with Travis Milcher and sought to force a sale to Travis Milcher for $250,000.00.

77.     When MoneyBox refused, MTE and Tyler sought to force a sale to Travis Milcher for $100,000.00.

78.     MoneyBox refused.

79.     MoneyBox discovered when doing its due diligence in preparation for its sale of the Purchased ATM Assets and Non-Purchased ATM Assets that MTE failed to document transfer of the Purchased ATM Assets to Cash Today.

80.     Without the transfer documents, although MoneyBox owned the Purchased ATM Assets, MoneyBox would be unable to evidence ownership with documents to a prospective buyer, which would substantially affect the sale price of the Purchased ATM Assets.

81.     Therefore, MoneyBox made demand on MTE that it provide all documentation necessary to evidence transfer of the Purchased ATM Assets, as was required by the Asset Purchase Agreement and the agreement between MTE and Cash Today relating to purchase of

10

the Purchased ATM Assets.

82.    MTE refused.

83.    Instead, beginning on or about November 17, 2020, MTE and Tyler exercised dominion and control over the remaining Purchased ATM Assets and the Non-Purchased ATM Assets, including obtaining access to ATM machines, contacting ATM customers, and giving direction to SwypCo to pay the surcharges and fees associated with an owner of the Purchased ATM Assets to MTE or Tyler.

84.    Upon information and belief, MTE and Tyler also, either directly or through agents, exercised dominion and control over the Non-Purchased ATM Assets, including obtaining access to ATM machines, contacting ATM customers, and giving direction to SwypCo that MoneyBox no longer receive the surcharges and fees associated with an owner of the Non-Purchased Assets.

85.    These actions were wrongful and in direct contradiction to MTE's and Tyler's and MoneyBox's rights as successor-in-interest to Cash Today pursuant to the agreement for sale of the Purchased ATM Assets.

86.    The actions displaced MoneyBox from its right to dominion and control over the remaining ATM Assets and Non-Purchased ATM Assets, including the right to access ATM machines, the functional ability to maintain relationships with ATM customers, and the right to receive the surcharges and fees associated with an owner of the Purchased ATM Assets.

87.    MTE and Tyler took these wrongful actions without notice to MoneyBox and without any right to take these wrongful actions.

88.    By various verbal and written communications, MoneyBox made demand that MTE and Tyler discontinue these wrongful actions.

89.    MTE and Tyler refused.

90.    By letter from the undersigned attorney dated February 18, 2021, MoneyBox made additional demand upon MTE and Tyler to discontinue these wrongful actions.

91.    MTE and Tyler continued to refuse.

92.    MTE and Tyler are exercising wrongful dominion and control over the interests and profits relating to the Purchased ATM Assets to the wrongful exclusion of MoneyBox.

93.    Upon information and belief, MTE and Tyler, directly or through agents, are exercising wrongful dominion and control over the interests and profits relating to the Non-Purchased ATM Assets to the wrongful exclusion of MoneyBox.

94.    MTE's and Tyler's wrongful actions have interfered with MoneyBox's business relationships and otherwise caused MoneyBox significant damage, including incurring attorneys' fees and costs.

95.    MTE's and Tyler's failure to document transfer of the Purchased ATM Assets and interference with MoneyBox's attempts to sell the remaining Purchased ATM Assets and the Non-Purchased ATM Assets disrupted sale of the remaining Purchased ATM Assets and the Non-Purchased ATM Assets by MoneyBox.

96.    MTE and Tyler's various wrongful actions were and are intentional, willful, outrageous, and malicious.

97.    MoneyBox's non-litigation attempts to persuade MTE and Tyler to discontinue their wrongful actions and provide appropriate money damages to MoneyBox have not been successful.

## COUNT I
### (Breach of Contract – MTE)

98.     The Plaintiffs[1] re-allege all above-stated allegations by incorporation as if asserted in this Count.

99.     MTE and Cash Today entered into an express contract as more particularly identified above relating to MTE's sale and Cash Today's purchase of the Purchased ATM Assets.

100.    Both MTE and Cash Today had the capacity to enter into the express contract.

101.    MTE and Cash Today reached mutual agreement with regard to sale and purchase of the Purchased ATM Assets as more particularly identified above.

102.    Cash Today provided valid consideration in the form of payment of $615,000.00, plus the amount of the additional cash in circulation, to MTE for purchase of the Purchased ATM Assets.

103.    Cash Today fully performed all obligations relating to the express contract.

104.    MTE materially defaulted on its obligations relating to the express contract as more particularly identified above.

105.    MTE's material defaults have caused Plaintiffs damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on Count I against MTE awarding Plaintiffs monetary judgment in the amount of all damages caused by MTE's breaches of contract, which is no less than the value of the Purchased ATM Assets not fully transferred by MTE to Cash Today or over which MTE and Tyler ultimately exercised dominion and control to the exclusion of Plaintiffs, plus all interests and profits generated by the

---

[1] Each of Cash Today and MoneyBox seek recovery on this and all other Counts. No non-duplicative recovery is sought, but Cash Today and MoneyBox collectively seek recovery against Defendants for all damages caused to the extent only that each continues to own rights relating to the actions taken and damages caused.

Purchased ATM Assets not provided to Plaintiffs due to the actions of MTE and Tyler, plus the imposition of an equitable lien or constructive trust over the remaining Purchased ATM Assets and all interests and profits relating thereto, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus all other damages caused by MTE's failure to perform pursuant to the contract to sell the Purchased ATM Assets and afterward act consistently with that contract, plus such other relief as is just and appropriate under the circumstances.

## COUNT II
### (Fraud and Fraudulent Misrepresentation - MTE and Tyler)

106.    The Plaintiffs re-allege all above-stated allegations by incorporation as if asserted in this Count.

107.    MTE and Tyler represented to Cash Today that an express contract existed for MTE to sell and Cash Today to purchase the Purchased ATM Assets pursuant to the terms of the Asset Purchase Agreement and as otherwise stated above.

108.    MTE and Tyler represented to Cash Today that it agreed to sell the Purchased ATM Assets to Cash Today pursuant to the terms of the Asset Purchase Agreement and as otherwise stated above, including that in consideration of Cash Today's payment of $615,000.00, plus the amount of additional cash in circulation, MTE would sell and fully transfer the Purchased ATM Assets to Cash Today.

109.    MTE and Tyler represented that the transaction by and between MTE and Cash Today that closed on or about March 13, 2019 was a sale of the Purchased ATM Assets by MTE to Cash Today.

110.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, MTE's and Tyler's

representations to Cash Today relating to the parties' transaction were false.

111.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, MTE's and Tyler's misrepresentations to Cash Today relating to the parties' transaction were material.

112.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, MTE and Tyler knew that their representations to Cash Today relating to the parties' transaction were false.

113.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, MTE and Tyler made the misrepresentations relating to the parties' transaction with the intention that Cash Today would act upon the misrepresentations, including by making payment of $615,000.00, plus the amount of additional cash in circulation.

114.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, Cash Today did not know that MTE's and Tyler's representations relating to the parties' transaction were false.

115.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, Cash Today reasonably relied upon MTE's and Tyler's misrepresentations relating to the parties' transaction in making payment of $615,000.00, plus the amount of additional cash in circulation, to purchase the Purchased ATM Assets.

116.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, MTE and Tyler had an obligation not to make materially false representations to Cash Today relating to the parties'

transaction.

117.    MTE's and Tyler's misrepresentations relating to the parties' transaction, and Cash Today's actions taken in reasonable reliance thereon, caused Cash Today damage.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on Count II against MTE and Tyler awarding Plaintiffs monetary judgment in the amount of all damages caused by MTE's and Tyler's fraudulent misrepresentations, which is no less than the value of the Purchased ATM Assets not fully transferred by MTE to Cash Today or over which MTE and Tyler ultimately exercised dominion and control to the exclusion of Plaintiffs, plus all interests and profits generated by the Purchased ATM Assets not provided to Plaintiffs due to the actions of MTE and Tyler, plus the imposition of an equitable lien or constructive trust over the remaining Purchased ATM Assets and all interests and profits relating thereto, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus all other damages caused by MTE's and Tyler's misrepresentations, plus such other relief as is just and appropriate under the circumstances.

**COUNT III**
**(Equitable Rescission - MTE)**

118.    Plaintiffs re-allege all above-stated allegations by incorporation as if asserted in this Count.

119.    To the extent that MTE and Tyler deny herein that an express contract existed between MTE and Cash Today for sale of the Purchased ATM Assets, MTE's and Tyler's materially false representations relating to the parties' transaction and Cash Today's actions taken in reasonable reliance on those materially false representations alternatively entitle Plaintiffs to equitable rescission of the express contract between MTE and Cash Today relating to the Purchased ATM Assets.

16

WHEREFORE, the Plaintiffs alternatively respectfully request that this Court enter judgment on Count III against MTE, equitably rescind the parties' contract, place MTE and Plaintiffs as close as possible to the position and interests they occupied and held prior to the parties' contract, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus such other relief as is just and appropriate under the circumstances.

**COUNT IV**
**(Rescission - Mutual Mistake - MTE)**

120.    The Plaintiffs re-allege all above-stated allegations by incorporation as if assert in this Count.

121.    Alternatively, if MTE did not intend to sell the Purchased ATM Assets to Cash Today in consideration of the payment of $615,000.00, plus the amount of additional cash in circulation, MTE and Cash Today mutually mistook the material terms of the parties' contract and did not reach a meeting of the minds.

WHEREFORE, the Plaintiffs alternatively respectfully request that this Court enter judgment on Count IV against MTE, deem the parties' contract rescinded based on mutual mistake or that no contract existed due to the parties not reaching a meeting of the minds on material terms, place MTE and Plaintiffs as close as possible to the position and interests they occupied and held prior to the parties' contract, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus such other relief as is just and appropriate under the circumstances.

**COUNT V**
**(Unjust Enrichment - MTE)**

122.    The Plaintiffs re-allege all above-stated allegations by incorporation as if asserted in this Count.

123.    Alternatively, to the extent that no express contract existed between MTE and Cash Today, Cash Today conferred the benefit of $615,000.00, plus the amount of additional cash in circulation, on MTE.

124.    The $615,00.00, plus the amount of the additional cash in circulation, benefit conferred to MTE was at the expense of Cash Today to the extent that MTE did not transfer the Purchased ATM Assets to Cash Today.

125.    MTE has an appreciation of the fact of the benefit conferred on MTE by Cash Today.

126.    Acceptable and retention of the full benefit under the circumstances without payment and restitution by MTE would be inequitable.

WHEREFORE, the Plaintiffs alternatively respectfully request that this Court enter judgment on Count V against MTE, award Plaintiffs damages in the amount that Cash Today conferred inequitable benefit on MTE relating to the Purchased ATM Assets, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus such other relief as is just and appropriate under the circumstances.

## COUNT VI
### (Tortious Interference with Business Relationships - MTE and Tyler)

127.    The Plaintiffs re-allege all above-stated allegations by incorporation as if asserted in this Count.

128.    Plaintiffs had valid contracts and business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the Non-Purchased ATM Assets.

129.    MTE and Tyler knew that Plaintiffs had valid contracts and business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the

Non-Purchased ATM Assets.

130.    MTE and Tyler intentionally interfered with Plaintiffs' valid contracts and business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the Non-Purchased ATM Assets.

131.    MTE and Tyler disrupted Plaintiff's business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the Non-Purchased ATM Assets.

132.    MTE and Tyler had no justification for intentionally interfering with Plaintiffs' valid contracts and business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the Non-Purchased ATM Assets.

133.    MTE and Tyler had no justification for disrupting Plaintiffs' business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the Non-Purchased ATM Assets.

134.    MTE's and Tyler's intentional interference and disruption of Plaintiffs' contracts and business relationships with their ATM customers and other third parties relating to the Purchased ATM Assets and the Non-Purchased ATM Assets caused Plaintiffs damage.

135.    Plaintiffs had prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets.

136.    MTE and Tyler knew that Plaintiffs had prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets.

137.    MTE and Tyler intentionally interfered with Plaintiffs' prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets.

19

138.    MTE and Tyler disrupted Plaintiff's prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets.

139.    MTE and Tyler had no justification for intentionally interfering with Plaintiffs' prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets.

140.    MTE and Tyler had no justification for disrupting Plaintiffs' prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets.

141.    MTE's and Tyler's intentional interference and disruption of Plaintiffs' prospective business relationships with prospective purchasers of the Purchased ATM Assets and the Non-Purchased ATM Assets caused Plaintiffs damage.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on Count VI against MTE and Tyler awarding Plaintiffs monetary judgment in the amount of all damages caused by MTE's and Tyler's intentional interference with business relationships, which is no less than the value of the Purchased ATM Assets not fully transferred by MTE to Cash Today or over which MTE and Tyler ultimately exercised dominion and control to the exclusion of Plaintiffs, plus the value of the Non-Purchased Assets, plus all interests and profits generated by the Purchased ATM Assets and Non-Purchased ATM Assets not provided to Plaintiffs due to the actions of MTE and Tyler, plus the imposition of an equitable lien or constructive trust over the remaining Purchased ATM Assets and Non-Purchased ATM Assets and all interests and profits relating thereto, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus all other damages caused by MTE's and Tyler's intentional interference, plus such other relief as is just and appropriate under the circumstances.

## COUNT VII
### (Conversion - MTE and Tyler)

142.     The Plaintiffs re-allege all above-stated allegations by incorporation as if asserted in this Count.

143.     MTE and Tyler exercised unauthorized and wrongful dominion and control over the Purchased ATM Assets and Non-Purchased Assets and all related property and ownership interests of Plaintiffs by, beginning on or about November 17, 2020, exercising dominion and control over the Purchased ATM Assets and the Non-Purchased ATM Assets, including obtaining access to ATM machines, contacting ATM customers, and giving direction to SwypCo to pay the surcharges and fees associated with an owner of the Purchased ATM Assets to MTE or Tyler.

144.     Upon information and belief, MTE and Tyler also, either directly or through agents, exercised dominion and control over the Non-Purchased ATM Assets and related property and ownership interests of MoneyBox, including obtaining access to ATM machines, contacting ATM customers, and giving direction to SwypCo that MoneyBox no longer receive the surcharges and fees associated with an owner of the Non-Purchased Assets.

145.     By various verbal and written communications, Cash Today and MoneyBox made demand that MTE and Tyler discontinue these wrongful actions.

146.     MTE and Tyler refused.

147.     By letter from the undersigned attorney dated February 18, 2021, MoneyBox made additional demand upon MTE and Tyler to discontinue these wrongful actions.

148.     MTE and Tyler continued to refuse.

149.     MTE and Tyler have and are exercising wrongful dominion and control over the interests and profits relating to the Purchased ATM Assets to the wrongful exclusion of

21

MoneyBox.

150.    Upon information and belief, MTE and Tyler, directly or through agents, are exercising wrongful dominion and control over the interests and profits relating to the Non-Purchased ATM Assets to the wrongful exclusion of MoneyBox.

151.    MTE and Tyler intentionally exercised wrongful dominion and control over the Purchased ATM Assets and, upon information and belief, the Non-Purchased ATM Assets.

152.    MTE and Tyler exercised wrongful dominion and control over the Purchased ATM Assets and, upon information and belief, the Non-Purchased ATM assets to the exclusion of Plaintiff's right to possession, dominion and control, and interests and profits from the Purchased ATM Assets and Non-Purchased ATM Assets.

153.    MTE's and Tyler's wrongful actions have caused Plaintiffs damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on Count VII against MTE and Tyler awarding Plaintiffs monetary judgment in the amount of all damages caused by MTE's and Tyler's wrongful conversion, which is no less than the value of the Purchased ATM Assets not fully transferred by MTE to Cash Today or over which MTE ultimately exercised dominion and control to the exclusion of Plaintiffs, plus the value of the Non-Purchased Assets, plus all interests and profits generated by the Purchased ATM Assets and Non-Purchased ATM Assets not provided to Plaintiffs due to the actions of MTE and Tyler, plus the imposition of an equitable lien or constructive trust over the remaining Purchased ATM Assets and Non-Purchased ATM Assets and all interests and profits relating thereto, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus all other damages caused by MTE's and Tyler's wrongful conversion, plus such other relief as is just and appropriate under the circumstances.

<u>COUNT VIII</u>
**(Deceptive Trade Practices – MTE and Tyler)**

154.    The Plaintiffs re-allege all above-stated allegations by incorporation as if asserted in this Count.

155.    As detailed above, MTE and Tyler knowingly made false representations with respect to the sale transaction between MTE and Cash Today.

156.    As detailed above, MTE and Tyler failed to make delivery of the goods and services agreed to be sold as part of the transaction between MTE and Cash Today.

157.    As detailed above, MTE and Tyler failed to disclose material facts in connection with the transaction between MTE and Cash Today.

158.    Cash Today and, as its successor-in-interest, MoneyBox is a victim of MTE's and Tyler's fraud and failures with respect to the transaction between MTE and Cash Today.

159.    Cash Today and MoneyBox have been directly harmed by MTE's and Tyler's fraud and failures with respect to the transaction between MTE and Cash Today.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on Count VIII against MTE and Tyler awarding Plaintiffs monetary judgment in the amount of all damages caused by MTE's and Tyler's deceptive trade practices, which is no less than the value of the Purchased ATM Assets not fully transferred by MTE to Cash Today or over which MTE ultimately exercised dominion and control to the exclusion of Plaintiffs, plus the value of the Non-Purchased Assets, plus all interests and profits generated by the Purchased ATM Assets and Non-Purchased ATM Assets not provided to Plaintiffs due to the actions of MTE and Tyler, plus the imposition of an equitable lien or constructive trust over the remaining Purchased ATM Assets and Non-Purchased ATM Assets and all interests and profits relating thereto, plus pre-judgment and post-judgment interest, plus attorneys' fees and costs, plus punitive damages, plus

statutory damages, plus all other damages caused by MTE's and Tyler's deceptive trade practices, plus such other relief as is just and appropriate under the circumstances.[2]

Respectfully submitted,

DENTONS US LLP

By:/s/ Robert A. Hammeke
Robert A. Hammeke   KS Bar 19707
4520 Main Street, Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Facsimile: (816) 531-7545
robert.hammeke@dentons.com

ATTORNEYS FOR PLAINTIFFS

---

[2] Plaintiffs reserve the right to assert additional claims against MTE and Tyler, add as additional parties any co-conspirators with respect to MTE's and Tyler's wrongful actions, or add as additional parties any parties that took wrongful actions that caused damage to Plaintiffs.

24

# EXHIBIT

# B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CASH TODAY LLC, and<br>MONEYBOX ATM NEVADA LLC, | )<br>)<br>) |
|     **Plaintiffs,** | )<br>)  **Case No.2:21-CV-2360-EFM**<br>) |
| **vs.** | )<br>) |
| **MTE LLC a/k/a MTE PLATINUM CASH<br>LLC, and MICHAEL W. TYLER, SR.** | )<br>)<br>) |
|     **Defendants.** | )<br>) |

### ORDER APPOINTING RECEIVER AND GRANTING PRE-JUDGMENT ATTACHMENT AND GARNISHMENT AND PRELIMINARY INJUNCTION

This cause came before the Court for hearing on July 8, 2025, on the Emergency Motion for Order Appointing Receiver, Pre-Judgment Attachment, Pre-Judgment Garnishment, and Preliminary Injunction ("Motion") (Dkt. 199) filed by Plaintiffs Cash Today LLC and MoneyBox ATM Nevada LLC ("Plaintiffs"). The Motion is supported by Plaintiffs' Memorandum in Support of Emergency Motion for Order Appointing Receiver, Pre-Judgment Attachment, Pre-Judgment Garnishment, and Preliminary Injunction and its Exhibits ("Memorandum in Support") (Dkt. 200). Robert A. Hammeke of Dentons US LLP appeared for the Plaintiffs and argued in support of the Motion. Charles Edgeller of the Law Office of Daniel E. Stuart, P.A. appeared for Defendants MTE LLC a/k/a MTE Platinum Cash LLC ("MTE") and Michael W. Tyler, Sr. ("Tyler" and together with MTE, the "Defendants") and argued in opposition of the Motion. Defendants did not file a Memorandum in Opposition or other opposing papers. The Court being fully advised in the premises, **ORDERS THAT THE MOTION IS HEREBY GRANTED AND HEREBY FINDS AND ORDERS AS FOLLOWS:**

US_ACTIVE\130722606\V-1

1.      Proper notice was provided of the Motion, and the Court finds that emergency circumstances, as detailed in the Memorandum in Support and as stated by the Court from the bench at the hearing, warranted that the Court hear and decide the Motion on 7 days' notice.

2.      For the reasons stated in the Memorandum in Support and stated by the Court from the bench at the hearing, appointment of a receiver is warranted pursuant to Fed. R. Civ. P. 66, federal common law and this Court's equitable powers, and K.S.A. § 60-711 (receivership in support of attachment) because, among other reasons, the appointment of a receiver is necessary to prevent Defendants from further taking actions to evade payment of the final judgment of this Court that will be entered in favor of Plaintiffs against Defendants pursuant to this Court's April 21, 2025 Memorandum and Order (Dkt. 186) after determination of post-trial motions.

3.      For the reasons stated in the Memorandum in Support and stated by the Court from the bench at the hearing, a pre-judgment attachment of all the property, assets, rights, interests, and business of both MTE and Tyler is warranted pursuant to Fed. R. Civ. P. 64 and K.S.A. § 60-701(4) and (5) because the Court expressly finds that Defendants have and are converting their property into money for the purpose of placing it beyond the reach of creditors, and because Defendants have and are concealing, removing, assigning, conveying or otherwise disposing of their property or effects so as to hinder or delay creditors – namely Plaintiffs.

4.      For the reasons stated in the Memorandum in Support and stated by the Court from the bench at the hearing, a pre-judgment garnishment is warranted pursuant to Fed. R. Civ. P. 64 and K.S.A. §§ 60-730 and 60-706 (garnishment pursuant to attachment order) for the same reasons as a pre-judgment attachment is warranted.

5.      For the reasons stated in the Memorandum in Support and stated by the Court from the bench at the hearing, a preliminary injunction is warranted pursuant to Fed. R. Civ. P.

2

65 and common law to enjoin both MTE and Tyler from taking any further action with respect to the Receivership Property (as defined below).

**IT IS HEREBY ORDERED** that Christopher Dove of Fagan & Emert, LLC ("Receiver") is hereby appointed as receiver over all real and personal property, whether tangible or intangible, all assets, all rights, all interests, all business, and all rights to govern and make decisions on behalf of MTE. For the avoidance of doubt, the Receiver shall take complete and exclusive control over all property and affairs of MTE. The Receiver is hereby also appointed as receiver over all real and personal property, whether tangible or intangible, all assets, all rights, all interests, and all business of Tyler. Tyler may continue to govern his personal affairs without interfering with the rights and responsibilities of the Receiver. The Receiver shall take and enjoy exclusive possession, custody, and control of all real and personal property, whether tangible or intangible, all assets, all rights, all interests, and all business of both MTE and Tyler, wherever located, however titled, and in whatever form (collectively, "Receivership Property"). The Court intends the broadest possible interpretation of the meaning and scope of Receivership Property, which shall include all real and personal property including, without limitation, any businesses operated by or at the instance of either MTE or Tyler, equipment, fixtures, furnishings, records, inventory, assets, royalties, rents, profits, income, funds, cash, receivables, accounts, deposits, equities, centralized and decentralized money, governmental and centralized currencies, decentralized currencies, cryptocurrencies, precious metals and gems, collectibles, all other tangible and intangible things of value, and all other related property interests. Notwithstanding the foregoing or other directives in this Order, neither Tyler nor his family members shall be displaced from their residence absent further motion and order from this Court.

US_ACTIVE\130722606\V-1

**IT IS HEREBY FURTHER ORDERED** that all Receivership Property is hereby attached. The Receiver shall benefit from such attachment and take and enjoy exclusive possession, custody, and control of all Receivership Property.

**IT IS HEREBY FURTHER ORDERED** that the Receiver may, in his discretion, obtain constructive possession over Receivership Property by notice to any party or non-party in possession of such Receivership Property, who shall take direction from the Receiver relating to the Receivership Property.

**IT IS HEREBY FURTHER ORDERED** that all Receivership Property in possession of or owed by any non-party to either MTE or Tyler are hereby garnished and shall be paid or turned over to the sole and exclusive possession, custody, and control of the Receiver.

**IT IS HEREBY FURTHER ORDERED** that all parties and all non-parties with notice of this Order are hereby enjoined and directed to act as further provided in this Order.

**IT IS HEREBY FURTHER ORDERED AS FOLLOWS:**

1.    **Description of Receivership Property:**

"Receivership Property" shall have the meaning defined above.

2.    **Receiver's Oath and Bond:**

The Receiver shall execute and file a Receiver's Oath.  As soon as practical after this appointment, the Receiver shall also post a Receiver's Bond from an appropriate insurer in the sum of $25,000.00, conditioned upon the faithful performance of the Receiver's duties.  The cost of the Receiver's Bond and any renewals or extensions is an expense of the receivership estate paid from Receivership Property. The Receiver may commence his responsibilities in furtherance of this Order as long as the Receiver's Oath and Receiver's Bond are forthcoming.

US_ACTIVE\130722606\V-1

**3.      Receiver's Fees and Professionals:**

The Receiver shall be compensated at the rate of $325/hour, and the Receiver may utilize other professionals at his law firm at their customary rates.  The Receiver or his office may engage employees, agents, or independent contractors as is necessary or appropriate for the Receivership Property, receivership estate, or to fulfill the responsibilities set forth in this Order. The Receiver and his law firm may act in all respects as the attorneys for and on behalf of the receivership estate or, in his discretion, the Receiver may engage such other attorneys or other professionals as are deemed necessary or appropriate to fulfill the responsibilities of the Receiver. All fees and costs of the Receiver and the professionals of the Receiver shall be accounted for by the Receiver.  In the ordinary course, without further Order of the Court, the Receiver and the professionals of the Receiver shall be entitled to fees and reimbursement of all reasonable and necessary expenses from funds of the receivership estate for such time as is reasonable and necessary for the Receiver to accomplish the responsibilities set forth in this Order.  Such payments to the Receiver shall be on an interim basis only and shall be subject to and contingent on final approval by the Court after the filing of an appropriate motion; provided, the Receiver may file motions for interim approval of fees and costs.

**4.      Receiver's Power and Authority:**

The Receiver is hereby given the power and authority to:

(A)     Take immediate and exclusive possession, custody, and control of the Receivership Property;

(B)     Care for, preserve, and maintain the Receivership Property. The Receiver may incur any reasonable and necessary expenses necessary for this purpose.  All such expenses shall be paid from funds of the receivership estate;

**(C)**     Change all locks, passcodes, or other means of granting or denying access to the
Receivership Property and limit access thereto;

**(D)**     Maintain, protect, collect, lease, market, sell (subject to further Order of this
Court), and operate the Receivership Property;

**(E)**     Negotiate agreements ancillary to the operation of the Receivership Property;

**(F)**     Gain access to all financial institution, trade and all other accounts relating to the
Receivership Property and withdraw and otherwise transfer funds from such
accounts into receivership accounts, which shall be opened by the Receiver using
his or his law firm's or MTE's or Tyler's tax identification numbers; and make
disbursements in payment of expenses incurred by the Receiver or expenses
which otherwise benefited the Receivership Property in accordance with this
Order;

**(G)**     Hire, on a contract basis, professionals, employees, real estate brokers, personal
property brokers, and other personnel necessary to manage, preserve, and operate
the Receivership Property;

**(H)**     Hire, employ, pay and terminate agents, independent contractors, or employees;
purchase services at ordinary and usual rates and prices using receivership estate
funds that shall come into the Receiver's possession; collect or compromise debts
of the receivership estate; incur risks and obligations ordinarily incurred by
owners, managers, and operators of similar businesses or owners of similar
property, which in the Receiver's reasonable judgment are necessary for the
operation of the business or possession and control of the Receivership Property,

6

and no such risk or obligation incurred shall be the personal risk or obligation of the Receiver, but only that of the receivership estate.

**(I)**    Take possession of and operate pursuant to all licenses, permits, or other government issued documents necessary for the continued operation of the Receivership Property.  If the issuing agency requires that the Receiver apply for a new license, permit, or other document, the Receiver shall be allowed to continue to operate under the current license, permit, or other document until the new one is issued to ensure no disruption of service occurs;

**(J)**    Enter contracts, leases, agreements, and instruments as the Receiver reasonably believes necessary for the possession, control, and operation of the Receivership Property and terminate or reject any existing contract, lease, agreement, or instrument as deemed prudent by the Receiver, and all damages, claims or causes of action arising from such termination or rejection shall be and are pre-receivership claims and obligations;

**(K)**    Borrow from Plaintiffs or third parties, with Plaintiffs given the first right, funds necessary to complete the responsibilities of this Order when current income is insufficient to meet expenses, upon such terms as deemed reasonable by the Receiver;

**(L)**    Secure, take possession and control of, and collect all rents, income, profits, monies, funds, and cash that is Receivership Property, which now or hereafter may be part of, due from, or relating to the Receivership Property or related businesses, including such rents, income, profits, monies, funds, and cash that is

7

Receivership Property, presently held in bank accounts relating to the Receivership Property;

**(M)**   Initiate, defend, negotiate, settle, or otherwise dispose of any claim or litigation that concerns the Receivership Property or receivership estate;

**(N)**   Occupy the rights of any creditor or other party with standing to initiate, defend, negotiate, settle, or otherwise dispose of any claim or litigation available pursuant to any and all applicable state and federal fraudulent transfer, preference, and other avoidance laws, including but not limited to Kansas' enactment of the Uniform Fraudulent Transfer Act and such actions are available under Title 11 of the United States Code;

**(O)**   Exercise the powers of MTE, its officers, directors, members, general partners, or persons who exercise similar powers or perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code or to commence any other insolvency proceeding relating to MTE or any Receivership Property;

**(P)**   Receive and endorse checks relating to the Receivership Property in the Receiver's name or in MTE's and or Tyler's name;

**(Q)**   Make demand for information and issue subpoenas to any party in possession of Receivership Property, information that the Receiver believes relates to or will lead to discovery of Receivership Property, or item that are covered in this Order;

**(R)**   Abandon Receivership Property the Receiver considers to be of little or no value to the receivership estate;

**(S)**   Use MTE's or Tyler's tax identification number(s) for all purposes;

8

**(T)**      The Receiver shall not be obligated to file any federal or state income tax returns, schedules, or other forms for MTE or Tyler, but shall upon reasonable request of MTE or Tyler, provide MTE or Tyler with such information as is necessary to enable them to prepare and file any federal, state, or local income tax returns, schedules or other forms required under applicable law. The Receiver shall have no liability in the event MTE or Tyler do not file any federal, state, or local tax returns, schedules or other forms required under applicable law.

**5.**      **Inventory:**

As soon as practical after entry of this Order, the Receiver shall file and serve on all parties an inventory of all the Receivership Property taken into possession or control pursuant to this Order.

**6.**      **Receiver Reports:**

As practical, the Receiver shall prepare, file, and serve on all parties interim reports of the condition and operation of the Receivership Property in the receivership estate. The Receiver shall follow accounting standards typical for similar Receivership Property and related businesses and may enlist the aid of accountants for preparation of Receiver's reports to the Court. Any objections to the Receiver's reports must be filed within thirty (30) days of the filing of such report. The Receiver may pay its fees and other professional's fees in the ordinary course, subject to disgorgement to the extent not later approved by this Court.

**7.**      **Management of the Receivership Property and/or Business Entity:**

Receiver shall operate and manage the Receivership Property and operate any related business entity. The Receiver shall collect rents, income, profits, monies, funds, and cash, and pay obligations incurred by the receivership estate in the ordinary course. Notwithstanding any

9

language in this paragraph or otherwise in this Order, the Receiver and receivership estate shall not be liable for any expense or obligation not incurred by the Receiver, including that the Receiver and receivership estate shall not be liable for any expense or obligation incurred by MTE or Tyler or relating to the Receivership Property that was incurred prior to the Receiver's appointment. However, the Receiver may pay such pre-receivership expenses or obligations if in the discretion of the Receiver it benefits the receivership estate.

      **8.**      **Law Enforcement Assistance:**

Receiver, as agent of the Court, shall be entitled to the assistance of law enforcement officials when taking possession of Receivership Property, or at any other time during the term of the receivership, if in the opinion of Receiver, such assistance is necessary to preserve the peace and protect the Receivership Property, without further order from this Court.

      **9.**      **Bank Accounts:**

The Receiver shall have the power to take possession of, and receive from all depositories, banks, brokerages and otherwise, any money or other item of value on deposit in such institutions associated with, belonging to, arising from or otherwise related to the Receivership Property, whether such funds be in accounts titled in the name of MTE or Tyler or a third party, and Receiver may indemnify the institution upon whom such demand is made, and is empowered to open or close any such accounts. The Receiver shall deposit monies and other items of value collected and received in connection with the receivership estate at federally insured banking institutions or savings associations. All such institutions, upon presentation of a copy of this Order by the Receiver, shall provide copies of any requested records relating to any accounts relating to the Receivership Property to the Receiver. The Receiver may add its agents or employees as additional signatories to any bank accounts, money market accounts, CD's or any other financial instruments or accounts controlled by the Receiver. The Court specifically finds that accounts relating to which Tyler has signatory or other authority in the name of

10

Airtime or Airtime, Inc. or a similar title are subject to the provisions of this paragraph.

**10.    Delivery of Rents, Income, Profits, Money, Funds, and Cash:**

Upon entry of this Order, MTE and Tyler and non-parties with notice of this Order shall immediately deliver to the Receiver all rents, income, profits, money, funds, and cash of MTE and Tyler, wherever located. The Receiver shall give direction to all non-parties that make payments of, or have possession of, rents, income, profits money, funds, and cash to or of MTE or Tyler to thereafter make payment to of follow the direction of the Receiver.  The Receiver may demand, collect, and receive all rents, income, profits, money, funds, cash, or any part, owed, unpaid, and collected or uncollected as of the effective date of this Order, or which hereafter becomes due to or for the benefit of MTE or Tyler.

**11.    Use of Receivership Property:**

The Receiver shall pay expenses that are reasonable and necessary for the operation or the protection of the Receivership Property and otherwise deposit and preserve all other funds pending further order of this Court.

**12.    Insurance for Receivership Property:**

MTE and Tyler shall immediately provide the Receiver with copies of all existing insurance policies for or related to the Receivership Property, the assets of the Receivership estate, or maintained by MTE or Tyler or with respect to the Receivership Property or related businesses. The Receiver shall be named as an additional insured, including property damage, and general liability policies for the Receivership Property. The Receiver shall have the right to possess and control all right, title, and interest of MTE or Tyler or the insured in and to all proceeds from any claims made or to be made under any insurance policy maintained by MTE, Tyler, the Receiver, or any other party with respect to the Receivership Property. The Receiver shall have the right to modify, amend, or replace any insurance on the Receivership Property or obtain additional insurance as the Receiver deems reasonably necessary to protect the

11

Receivership Property. No existing insurer may cancel its existing policy because of the appointment of the Receiver. MTE and Tyler may not amend, modify, or cancel any existing insurance policy without the written consent of the Receiver.

**13.    Entry and Access to Receivership Property:**

The Receiver shall further be entitled to engage a locksmith or other appropriate person for the purposes of gaining entry to any Receivership Property that is the subject of this receivership and through any security system, to obtain any property or documents to which the Receiver is entitled pursuant to this Order, as well as giving any notices which may be required in performing the Receiver's duties. The Receiver may have locks or security codes changed or have keys created that will work for the existing locks.

**14.    Legal Counsel:**

The Receiver may hire legal counsel and pay for legal services at such rates as the Receiver deems appropriate for the services provided, including that the Receiver or other professionals at his law firm may, in all respects, provide legal services for and on behalf of the receivership estate. Legal fees and costs incurred by the Receiver in performance of its duties may be included and paid as an expense of the receivership from the Receivership Property.

**15.    Receiver's Certificates:**

If receivership estate assets are insufficient to meet normal expenses and costs, the Receiver is authorized to borrow money and to issue Receiver's Certificates to secure such indebtedness. The Receiver must first offer the opportunity to loan to Plaintiffs. The Receiver's Certificates issued shall have priority over all other general claims against the receivership estate and collectively constitute a lien and charge upon all the assets of the receivership estate. As funds in the receivership estate are deemed by the Receiver to be more than necessary for normal expenses and costs, the Receiver may redeem these Certificates by making repayment.

**16.    Receiver's Final Report and Account:**

12

As soon as practicable after the need for the termination of the receivership, the Receiver shall file and serve to parties its Final Report, after which the Receiver or a party in interest shall file a motion seeking approval of the final report and discharge of the Receiver and termination of this receivership.  Notice of the motion and any hearing set relating to the motion shall be given to all parties and all persons whom the Receiver has received notice of potential claims against the receivership estate. The motion shall contain a summary of the receivership accounting including enumeration, by major categories, of total revenues and total expenditures, the net amount of any surplus or deficit with supporting facts, an identification of the basis for the termination of the receivership, and evidence to support an order for the distribution of any surplus, or payment of any deficit, in the receivership estate. The Receiver's Bond shall be canceled upon the Court's discharge of the Receiver.

**17.    Instructions from the Court:**

The Receiver and the parties may at any time apply to this Court for instructions or orders.  The Court may grant any order requested by the Receiver without further notice of hearing if no objection is filed with the Court and served on the Receiver and the parties within seven (7) days after filing and service of the Receiver's request.

**18.    General Provisions.**

(A) No party or non-party shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting the suit or action provided, that no prior court order is required to file a motion in this case to enforce the provisions of this Order or any other order of this Court.

(B) The Receiver, receivership estate and its employees, agents, independent contractors, attorneys, and all professionals retained by the Receiver shall have no liability for any obligations or debts incurred by MTE or Tyler. No

13

claim shall be asserted against the Receiver, receivership estate or its/their employees, agents, independent contractors, attorneys, or professionals relating to the Receiver's duties under this Order without prior authority from this Court as stated in (A) above.  In no event shall the Receiver or such agents or professionals be liable to any entity for their good faith compliance with their duties and responsibilities as Receiver or as agent or professional for the Receiver, nor shall the Receiver or such agents or professionals be personally liable to anyone for any actions taken or omitted by it/them, except for gross negligence, willful misconduct, malfeasance, bad faith, reckless disregard of duties, and actions in willful violation of this Court's orders.  The Receiver shall have no liability for any existing environmental issues at the Receivership Property. Any claims or actions asserting liability against the Receiver or such agents or professionals, must be brought by motion in this case.

(C) The Receiver and its employees, agents, independent contractors, attorneys, and all professionals retained by the Receiver shall be held harmless from all suits in connection with the Receivership Property.

(D)  The Receiver may at any time file a motion requesting that it be exonerated, discharged, and released from its appointment as receiver, which shall be granted if cause exists.

**IT IS FURTHER ORDERED** that MTE and Tyler, their agents, managers, successors, and assigns, and other persons acting under, in concert with, or for MTE or Tyler, and any

14

financial institutions or other non-parties in possession of the Receivership Property, are ordered to:

    **(A)**    **Turnover of Receivership Property:**

Relinquish and turn over possession and control of the Receivership Property to the Receiver.

    **(B)**    **Turnover of Keys, Access, Books, and Records:**

Turnover to the Receiver all receivership estate assets, including check books, account statements, statements of income and expenses for the Receivership Property, the rents, income, profits, money, funds, and cash, and all books, documents, account and software passwords, and records related to the Receivership Property, written contracts, leases, copies of all agreements and correspondence files with vendors or service providers or other instruments which affect the Receivership Property, inventories, copies of all real and personal property tax statements, copies of the most recent insurance coverage on the Receivership Property, and all keys, passwords, and other means of access to the Receivership Property;

    **(C)**    **Turnover of Licenses, Permits, and Taxpayer ID Numbers:**

Turnover to the Receiver all documents that pertain to all licenses, permits, or government approvals relating to the Receivership Property and shall immediately advise the Receiver of federal and state taxpayer identification numbers used in connection with the Receivership Property, which Federal and State taxpayer identification numbers may be used by the Receiver for all purposes;

    **(D)**    **Notification of Insurance:**

Immediately advise the Receiver as to the nature and extent of insurance coverage on the Receivership Property.  MTE and Tyler are prohibited from canceling, reducing, or modifying any insurance coverage currently in existence with respect to the Receivership Property, except as otherwise specifically provided herein; and

15

**(E)     Turnover of Monies and Security Deposits:**

Immediately turnover to the Receiver all monies, including all rents, income, profits, money, funds, cash, pre-paid rents, back rents, accounts, security deposits, other deposits, funds in bank accounts or other depository accounts for the Receivership Property.

**(F)     Provide Accounting Information:**

Provide Receiver an accounting of, and produce all records and statements for, each account, deposit account, certificate of deposit, and account receivable held by or on behalf of MTE or Tyler relating to the Receivership Property, and to produce all records and documents pertaining to the Receivership Property; and

**(G)     Turnover all Receivership Property and Documents and Information:**

Otherwise turnover all Receivership Property and provide all documents and information relating to the Receivership Property.

**(H)     Respond to All Receiver Inquires:**

Respond with expedited diligence to all requests for information or documentation by the Receiver, including if deemed appropriate by the Receiver, meet personally with the Receiver and discuss Receivership Property and related items, including the requirements of this Order.

**IT IS FURTHER ORDERED** that pending further order of this Court, MTE and Tyler and their agents, managers, successors and assigns, and other persons acting under, in concert with, or for MTE or Tyler who have actual or constructive knowledge of this Order, and their agents and employees, are enjoined from, have no power or authority to act, and shall not:

**(A)     Commit Waste or Disposition:**

Commit or permit any waste on the Receivership Property or any part thereof, or suffer, commit, or permit any act on the Receivership Property or any part thereof in violation of law, or remove, transfer, encumber or otherwise dispose of any of the Receivership Property or any part thereof;

16

**(B)** **Collect Rents, Income, Profits, Money, Funds, or Cash:**

Demand, collect, receive, discount, or in any other way divert or use any of the rents, income, profits, money, funds or cash part of or from the Receivership Property and to the extent that MTE or Tyler or any such other non-party receives or is in possession of any rents, income, profits, money, funds, or cash or any other Receivership Property, such shall be and are held in trust for the benefit of the Receiver and the receivership estate and shall be immediately turned over to the Receiver;

**(C)** **Interfere with Receiver:**

Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession, control, or operation of the Receivership Property;

**(D)** **Transfer or Encumber the Receivership Property:**

Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property; or

**(E)** **File any Bankruptcy or Insolvency Proceeding:**

File a voluntary petition under Title 11 of the United States Code or commence any other insolvency proceeding relating to MTE or any Receivership Property. For the avoidance of doubt, no person or entity other than the Receiver shall have the authority or power to file a voluntary petition for MTE under Title 11 of the United States Code or to commence any other insolvency proceeding relating to MTE or any Receivership Property. If any party, agent, affiliate, creditor, or other individual or entity files or attempts to file a petition for bankruptcy protection under Title 11 of the United States Code on behalf of or affecting MTE or Tyler, or any assets or entities subject to this Receivership Order, the Receiver and all parties shall immediately notify this Court in writing within 24 hours of learning of such filing or attempted

17

filing. Such notice shall include a copy of the bankruptcy petition (if available), the docket number, and the court in which it was filed. This requirement applies irrespective of whether the filing was authorized or lawful, and is intended to preserve this Court's jurisdiction over the receivership estate.

**IT IS FURTHER ORDERED** that, except by leave of this Court, all creditors and parties in interest seeking to enforce any claim, right, or interest against MTE or Tyler or Receivership Property are barred by this Order from using any "self-help", setoff, recoupment or doing anything whatsoever to interfere in any way with the Receiver or the conduct of the receivership estate.

This Order shall be binding on the parties to this action, their officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive notice of this Order.

The Receivership Property is under the jurisdiction of this Court and all persons and/or entities with notice of this Order are hereby enjoined from transferring, conveying, encumbering, or in any way, dealing with the Receivership Property or from prosecuting any proceedings (including collection or enforcement proceedings) that involve the Receiver, the receivership assets, or the Receivership Property unless such person or persons first obtains the permission of this Court, except that Plaintiffs and Defendants may continue pursuit and defense of this case and any related appeal. Notwithstanding this Order, Plaintiffs and Defendants are authorized to reach agreement relating to the Receivership Property and the damages sought or entered in this case, provided the Receiver's fees and expenses are paid.

**IT IS FURTHER ORDERED** that all parties (including but not limited to financial institutions) in possession of assets subject to this Order are hereby ordered to turnover such assets to the Receiver upon demand.

18

**IT IS SO ORDERED**.

Dated: July 10, 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

19

SUBMITTED BY:

DENTONS US LLP

*/s/ Robert A. Hammeke*
Robert A. Hammeke, KS #19707
Rick Shearer, D. Kan. Bar #78295
4520 Main Street, Suite 1100
Kansas City, MO 64111
Telephone:  816-460-2400
Facsimile:  816-531-7545
robert.hammeke@dentons.com
rick.shearer@dentons.com
*Attorneys for Plaintiffs*

US_ACTIVE\130722606\V-1